20 P.3d 487 (2001)
STATE of Washington, Respondent,
v.
J.A., Appellant.
No. 46597-0-I.
Court of Appeals of Washington, Division 1.
April 2, 2001.
*488 Washington Appellate Project, Seattle, for Appellant.
Ann Marie Summers, Seattle, for Respondent.
BAKER, J.
Four days before J.A. was to have fully completed a deferred disposition on a drug charge, she was involved in an altercation in her home, which led to her decision to plead guilty to assault. Although the deferred disposition order prohibited any new law offenses, the juvenile court nevertheless dismissed the drug case based upon evidence that the altercation had been initiated by *489 J.A.'s mother and that J.A. had performed exceptionally well all other terms of her deferred disposition. Because the goals of the Juvenile Justice Act of 1977(JJA) focus on juvenile rehabilitation as well as accountability, we hold that RCW 13.40.127 grants a court discretion in determining what constitutes compliance with a deferred disposition order, and therefore affirm.

I
J.A. was arrested and charged with delivery of a controlled substance after another juvenile sold drugs to an undercover police officer and then gave some of the money to J.A. J.A. agreed to plead guilty and pursuant to RCW 13.40.127, the juvenile court entered an order of deferred disposition, the terms of which included:
1) 12 months community supervision
2) 48 hours community service
3) Counseling
4) Regular school attendance
5) No use or possession of drugs, alcohol or weapons
6) Drug and alcohol evaluation and random urinalysis tests
7) No new probable cause referrals or law offenses
8) Fine of $100.
Upon completion of the conditions in the order, her conviction was to be vacated.
J.A. exceeded the expectations of all who were involved in her community supervision. She studied hard in school, becoming an honors student. All of her urinalysis tests were negative. She contacted Joy Initiative and Orion Center to participate in their programs, regularly attending counseling sessions. Her follow-through on her counseling programs far surpassed the performance of most adults in the program. She was responsible about her curfew, calling both her counselor and her mother if she were occasionally going to be late. Her sense of leadership and responsibility led one of her counselors to believe J.A. was older than she was. She completed her community service and made partial payments on her fine.
On the weekend before her 12 month community supervision was complete and her case was to be dismissed, her mother, Ms. Landgraff, wrongly accused J.A. of taking her necklace. J.A. and her mother argued and when J.A. lost her temper and cursed at her mother, Ms. Landgraff hit J.A. in the mouth several times. She grabbed J.A. and dragged her to the front door of their home, telling her that she had to leave. Ms. Landgraff's boyfriend joined the fray and also grabbed J.A. Together, both adults pulled J.A. outside. During the struggle, the boyfriend's loaded gun fell out of his waistband and onto the ground. J.A. picked up the gun and pointed it at the two adults, who both ran immediately back inside the house and shut the door. J.A. threw the gun into the bushes.
J.A. was charged with second degree assault, and she advised the juvenile court that she would plead guilty. On that basis alone, Judge James Street entered an order revoking her deferred disposition and set for three weeks later a hearing on disposition of both her assault and drug offenses.
At the disposition hearing, J.A. argued for a manifest injustice disposition downward. Judge Julie Spector heard evidence of J.A.'s remarkable progress in community supervision. Witnesses on behalf of J.A. included not only family, but numerous program counselors. Although her probation counselor could not attend because she was on maternity leave, the court was advised of her insistence that J.A. remain in the community and have her slate wiped clean. The court was told that J.A. is a role model, responsible and compassionate. One counselor testified that of all the women who have participated in her program over the last 25 years, only three have followed through and J.A. was one of them. The court heard evidence that the assault was atypical and that if J.A. were sent to detention, she would not have access to the services that were helping her. Even the prosecutor admitted that he did not know that incarcerating J.A. for 15-36 weeks on each count was best for J.A.
At the conclusion of the hearing, the court remarked how unusual it was to have so many people from different segments of society *490 come forward to speak on behalf of someone in J.A.'s situation. The court found that J.A.'s assault was clearly provoked and would not have occurred but for Ms. Landgraff's initiation. After considering the facts of the case, the court concluded that J.A.'s altercation, occurring four days before the end of a deferred disposition, was not a sufficient basis to revoke the deferred disposition. The court noted that juvenile courts can and often do allow deferred dispositions to terminate early, but that J.A. did not have that opportunity because her probation counselor was on maternity leave and could not request it. The court then dismissed the drug charge and imposed an exceptional sentence down on the assault charge, thus permitting J.A. to remain in the community. The State appeals.

II
The sole issue before us is whether a court has discretion under RCW 13.40.127 to dismiss a case despite a juvenile's technical failure to comply with a condition of a deferred disposition order.[1] This appears to be an issue of first impression. RCW 13.40.127 of the JJA allows a juvenile court in certain circumstances to defer disposition of a juvenile who has been adjudicated or pled guilty to an offense. During this deferral period, a juvenile must be placed under community supervision and comply with "any conditions" a juvenile court deems appropriate.[2] In determining whether a juvenile has complied with an order of deferred disposition, the statute states:
(6) ... The [community supervision] counselor shall notify the court ... of any failure to comply .... [and t]he state shall bear the burden to prove, by a preponderance of the evidence, that the juvenile has failed to comply with the terms of community supervision.
(7) A juvenile's lack of compliance shall be determined by the judge upon written motion by the prosecutor or the juvenile's juvenile court community supervision counselor. If a juvenile fails to comply with terms of supervision, the court shall enter an order of disposition.
...
(9) At the conclusion of the period set forth in the order of deferral and upon a finding by the court of full compliance with conditions of supervision and payment of full restitution, the respondent's conviction shall be vacated and the court shall dismiss the case with prejudice.[3]
The State argues that subsection (9) allows no discretion by the juvenile court in determining what level of compliance is sufficient to dismiss a case. J.A. counters that although subsection (9) mandates dismissal upon a finding of full compliance, it does not preclude a court from exercising its discretion in dismissing a case when a juvenile has in good faith fulfilled the objectives of a deferred disposition order, even if she has not technically complied with every condition.
A court's interpretation of a statute is a question of law that is reviewed de novo under an error of law standard.[4] The rules of statutory interpretation are well established. A court does not construe an unambiguous statute, because plain words do not require construction.[5] A statute is ambiguous if it is susceptible to more than one meaning or reasonable interpretation.[6] Because each party in this case advances reasonable but opposing interpretations of the statute, we conclude that the statute is ambiguous.
*491 When interpreting an ambiguous statute, a court will construe it so as to effect the intent of the Legislature within the context of the entire statute.[7] All language within the statute must be given effect so that no portion is rendered meaningless or superfluous.[8] A court does not glean the meaning of a particular word from that word alone, but rather from the Legislature's intent within the statute as a whole.[9] The purposes of the JJA are explicitly set forth in RCW 13.40.010(2) as follows:
It is the intent of the legislature that a system capable of having primary responsibility for, being accountable for, and responding to the needs of youthful offenders... be established ... [and] that youth, in turn, be held accountable for their offenses and that communities, families, and the juvenile courts carry out their functions consistent with this intent.
Other "equally important purposes" of the JJA include:
a) Protect[ing] the citizenry from criminal behavior;
...
c) Mak[ing] the juvenile offender accountable for his or her criminal behavior;
d) Provid[ing] for punishment commensurate with age, crime, and criminal history of the juvenile offender;
...
f) Provid[ing] necessary treatment, supervision, and custody for juvenile offenders;
g) Provid[ing] for handling of juvenile offenders by communities whenever consistent with public safety; ...[10]
Although the JJA seeks a balance between the poles of rehabilitation and retribution, the purposes of accountability and punishment are tempered by and at times must give way to the purposes of responding to the needs of the juvenile.[11] Moreover, unlike the Sentencing Reform Act applicable in adult criminal proceedings, juvenile restitution is remedial, not punitive.[12]
In State v. T.C., the court achieved these purposes when it held that even absent explicit statutory authority, a juvenile court could consider a juvenile offender's admitted but uncharged crimes in imposing a disposition.[13] It reasoned that the behaviors of the juvenile provided the court with a means to assess the nature and extent of the juvenile's problems and to design a rehabilitation plan that best met the juvenile's needs.[14] Likewise, in State v. E.C.,[15] the court held that a juvenile court may act in conflict with statutory procedures regarding competency determinations if doing so would meet the needs of a juvenile offender and achieve the goals of the JJA.[16]
The language of RCW 13.40.127, considered in light of the purposes of the JJA, does not support the State's interpretation. First, subsection (5) sets a foundation for judicial discretion by allowing a juvenile court to impose "any conditions" of a deferred disposition that it deems appropriate.[17] This broad grant of authority acknowledges that the circumstances of individual juveniles are unique and that courts must have discretion to fashion orders that will effect both accountability and rehabilitation. Moreover, the parties agree that subsection (7) grants a juvenile court discretion in determining whether a juvenile has failed to comply with an order. Thus, even if a juvenile commits a technical violation of a deferred disposition order, the court, in its discretion and in light of the attendant facts *492 and circumstances, may enter an order finding no lack of compliance.
Despite this agreed interpretation of subsection (7), the State nevertheless argues that subsection (9) means that nothing but full and total compliance to the letter will allow a court to dismiss a case upon completion of a deferred disposition. But this draconian interpretation would defeat the discretion granted the juvenile court under subsection (7). It would require revoking the deferred disposition whenever any failure to comply occurred, no matter how trivial and regardless of the circumstances.
The facts of this case are serious in that they involve J.A.'s use of a weapon and an assault, albeit under circumstances that justified mitigation.[18] But under the State's interpretation, a juvenile's de minimis violation of a curfew by ten minutes would eliminate any possibility that her case could be dismissed upon completion of a deferred disposition. We conclude that the Legislature did not intend to so circumscribe the court's discretion to rule in the best interests of a juvenile. Thus, we hold that RCW 13.40.127(7) grants a juvenile court discretion to determine what constitutes lack of compliance with the conditions of a deferred disposition order. Further, once a court enters an order finding no lack of compliance, that order carries through to the determination of full compliance under subsection (9).
AFFIRMED.
COLEMAN, J., and COX, J., concur.
NOTES
[1] The State neither briefed nor cited any authority for its argument that Judge Spector had no authority to overrule Judge Street's order revoking J.A.'s deferred disposition. We therefore do not consider the issue. RAP 10.3; State v. Dennison, 115 Wash.2d 609, 629, 801 P.2d 193 (1990).
[2] RCW 13.40.127(5).
[3] RCW 13.40.127.
[4] State v. Bright, 129 Wash.2d 257, 265, 916 P.2d 922 (1996).
[5] Davis v. Dep't of Licensing, 137 Wash.2d 957, 963, 977 P.2d 554 (1999).
[6] Washington Fed'n of State Employees v. State Personnel Bd., 54 Wash.App. 305, 309, 773 P.2d 421 (1989).
[7] Davis, 137 Wash.2d at 963, 977 P.2d 554.
[8] Davis, 137 Wash.2d at 963, 977 P.2d 554.
[9] Davis, 137 Wash.2d at 963, 977 P.2d 554.
[10] RCW 13.40.010.
[11] State v. T.C., 99 Wash.App. 701, 707, 995 P.2d 98 (2000).
[12] State v. J.H., 96 Wash.App. 167, 182, 978 P.2d 1121, review denied, 139 Wash.2d 1014, 994 P.2d 849 (1999), cert. denied, 529 U.S. 1130, 120 S.Ct. 2005, 146 L.Ed.2d 956 (2000).
[13] 99 Wash.App. at 707-708, 995 P.2d 98.
[14] T.C., 99 Wash.App. at 707-08, 995 P.2d 98.
[15] 83 Wash.App. 523, 922 P.2d 152 (1996).
[16] E.C., 83 Wash.App. at 530-31, 922 P.2d 152.
[17] RCW 13.40.127(5).
[18] The parties have not argued and we therefore do not address the issue of whether the court in this case abused its discretion.